# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOEL PONCE GALVAN, | 1:07-cv-01482 OWW SMS (HC) |
|                 Petitioner, | FINDINGS AND RECOMMENDATION REGARDING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS |
|    v. | |
| | [Doc. 22] |
| ROBERT A. HOREL, Warden | |
|               Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

<u>RELEVANT HISTORY</u>

Following a jury trial in the Tulare County Superior Court, Petitioner was convicted of willful and premeditated attempted murder, robbery, and residential burglary (Cal. Penal Code[1] §§ 664/187(a), 211, 459), with gang allegations (§ 186.22(b)). Petitioner was sentenced to an aggregate term of thirty-one years to life. (CT 242-246, 251-253, 297-302.)

Petitioner filed a notice of appeal. On July 25, 2005, the California Court of Appeal, Fifth Appellate District affirmed the judgment. (Lodged Doc. No. 1.) The California Supreme Court denied review. (Lodged Doc. No. 2.)

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

Petitioner filed the instant federal petition for writ of habeas corpus on October 11, 2007. (Court Doc. 1.) The Court granted Petitioner's motion to stay the action and hold the petition in abeyance while he returned to exhaust the state court remedies. (Court Doc. 13.)

On January 23, 2009, Petitioner filed an amended petition-the operative pleading in this action. (Court Doc. 22.) Respondent filed an answer to the amended petition on May 27, 2009, and Petitioner filed a traverse on July 16, 2009. (Court Docs. 32, 35.)

STATEMENT OF FACTS

On January 17, 2001, at around 2 a.m. six gang members arrived at Alberto Contreras home and asked if they could "party" there. Contreras let them in his home and the group had a friendly encounter at first. (RT 35.) Contreras knew three of the six men. (Id.) The men were drinking beer. (RT 15, 16.) Contreras lived with a man identified as "Julia" who dressed like a woman and was present that evening. (RT 37, 58.) Contreras sold drugs at the time and had a reputation as being a drug dealer. (RT 60-61.)

One of the men, identified by Contreras as "Rafa" went into Contrera's bedroom and laid on the bed with him. The two were watching pornographic videos and smoking crank. (RT 37, 57, 71.) Julia was in the living room with the other men, who were also smoking crank. (RT 37.) Approximately 30 to 60 minutes later, two of the men, identified as Pulga and Camello went into the bedroom. (RT 55, 71-73.) Rafa put an object to Contreras head-which he said was a gun, tied his arms around his back with a television cord, and placed him on the ground. (RT 17-18.) Contreras was tied up, face down on the floor for approximately three to four hours. (RT 21.) During this time, five of the men were ransacking the house looking for money and drugs, and all six of the men took turns beating and kicking Contreras. (RT 19-20.) He was hospitalized for eight days. (RT 24-25, 28-29, 46-47, 58.) The men threatened to kill Contreras if he did not disclose the drugs and money. (RT 40.)

Contreras specifically identified Petitioner as one of the men who beat and threatened to kill him. Contreras also saw Petitioner leave the residence with his stereo. As a result of the beating, Contreras suffered 40 stab wounds in his back. (RT 23.) His upper back was stabbed

and his kidney and lung were punctured.  (RT 12, 23, 46.)  Contreras's home was burned down after he testified during the first trial of one of the men.  (RT 51.)

Tulare County Sheriff's Detective Mario Martin responded to the incident.  (RT 96-97.) Contreras's bedroom was in complete disarray.  (RT 98.)  There was a large pool of blood on a pillow in the middle of the bedroom.  (RT 99-101.)  A bloody kitchen knife was located near a sofa in the living room on the floor.  Sanchez ("Julia") was in his bedroom with the blankets pulled over him.  His hands, face, and hair were full of blood.  He appeared "frazzled" and scared.  Sanchez did not cooperate with police and refused medical treatment.  (RT 101-103.)

Contreras was interviewed at the hospital by Detective Martin.  Although he appeared to be in severe pain and had some difficulty communicating, he was able to identify Petitioner from a photographic lineup as one of the assailants.  (RT 105-109.)  Detective Martin went to Petitioner's home and found some of the property taken during the robbery.  (RT 109-112.)

Tulare County Deputy Sheriff Joe Aguilar worked in the local gang unit.  (RT 150.) Aguilar identified the local gangs in the area.  (RT 162.)  The Big Time Locos ("BTL"), claimed Orosi as their area.  (RT 166.)  The rival gangs are the Brown Pride Catela, North Side Orosi, and East Side Orosi.  (RT 171.)  It is common for gangs to commit assault and drive-by shootings. (RT 172.)

On September 9, 2000, Petitioner admitted that he was a member of the BTL gang.  In July 2002, Detective Aguilar served Petitioner with a STEP notice which informed him that he was recognized as a member of a gang by the State of California.  He was further advised that if he committed any gang-related offenses he could be subject to gang enhancements.  (RT 178-190, 187.)

Aguilar found a "role call" of gang members in the possession of Ponce.  (RT 178.) Petitioner's moniker, "Chuchi" was on the list.  In addition, Petitioner had "BTL" tattooed on his neck and "south side 13" tattooed on his arm.  Assailants Rafeal Ponce and Jose Jimenez were also known gang members.  (RT 177.)

It was Detective Aguilar's opinion that the instant offenses were committed for the benefit of the BTL criminal street gang since it would have provided the gang with drugs and money. It also promoted the gang's violent and retaliatory reputation within the community. These actions demonstrated to rival gang members that the BTL gang is violent and will control its own turf. (RT 190-192.)

Defense

Petitioner presented the testimony of his sister, Catalina Ponce, in support of his alibi defense. At the time of the offense, she lived with Petitioner in Orosi. (RT 233-234.) She testified that Petitioner was home the evening before the offense and was asleep when she woke up for work around 5:00 a.m. or 5:30 a.m. (RT 235.) She acknowledged speaking to several sheriff's deputies but denied speaking to Deputy Sheriff Domingo Flores. (RT 240.)

Rebuttal

Tulare County Sheriff's Deputy Domingo Flores assisted in the investigation of this case. (RT 258.) On January 17, 2001, he spoke to Petitioner's sister, Catalina. She told him that she had not seen Petitioner since the night before, and she did not say that Petitioner was in bed earlier that morning. (RT 259-260.)

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      <u>Standard of Review</u>

    Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133,  141 (2005) citing <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 405-06 (2000).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u>, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Lockyer,</u> at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." <u>Id.</u> (citations omitted).

    "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively

1 unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

2 Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254

3 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v.

4 Blodgett, 393 F.3d 943, 976-77 (2004).

5 Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501

6 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but

7 provided no reasoned decision, courts conduct "an independent review of the record . . . to

8 determine whether the state court [was objectively unreasonable] in its application of controlling

9 federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we

10 independently review the record, we still defer to the state court's ultimate decisions." Pirtle v.

11 Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

12 C.     Insufficient Evidence to Support Attempted Murder Conviction

13 Petitioner contends that there was insufficient evidence to support the jury's finding that

14 he committed willful, premeditated, and deliberate attempted murder.

15 The California Court of Appeal rejected this claim stating:

16        [Petitioner] argues that the evidence presented at trial was not sufficient to
   prove that the attempted murder was willful, deliberate, and premeditated, and
17     that therefore he was not eligible for the life sentence required by [California
   Penal Code] section 664, subdivision (a). "When an appellant asserts there is
18     insufficient evidence to support the judgment, our review is circumscribed.
   [Citation.] We review the whole record most favorably to the judgment to
19     determine whether there is substantial evidence-that is, evidence that is
   reasonable, credible, and of solid value-from which a reasonable trier of fact could
20     have made the requisite finding under the governing standard of proof." (In re
   Jerry M. (1997) 59 Cal.App.4th 289, 298.)

21

22        Because [Petitioner] was prosecuted as an aider and abettor, the
   prosecution was required to show only that his confederates attempted to commit
23     murder in a willful, deliberate, and premeditated fashion and that he aided and
   abetted them. (People v. Lee (2003) 31 Cal.4th 613, 627.)

24        The prosecution did not have to prove that [Petitioner], himself, acted
   willfully, deliberately, and with premeditation. In a prosecution for aiding and
25     abetting, "'it is the intent to encourage and bring about conduct that is criminal,
   not the specific intent that is an element of the target offense'" that the People
26     must prove. (People v. Prettyman (1996) 14 Cal.4th 248, 261.) So long as the
   direct perpetrator's crime is a reasonably foreseeable consequence of crimes the

27

28

6

aider and abettor encouraged or facilitated, the aider and abettor may be held liable for that reasonably foreseeable crime. (*Id*. at p. 262.) This rule is known as the natural and probable consequences doctrine. (*Id*. at p. 261.)

[Petitioner] argues that the natural and probable consequences doctrine does not apply, and therefore an aider and abettor "'must share the specific intent of the [direct] perpetrator,'" i.e., here, must share in the willfulness, deliberation, and premeditation. (*People v. Lee*, *supra*, 31 Cal.4th at p. 624.) We see no reason why the doctrine would not apply here, however, and [Petitioner] supplies none. We do note (although the parties do not raise the point) that the court failed to mention the natural and probable consequences doctrine when it instructed on aiding and abetting. It also did not instruct the jury regarding so-called "target crimes" in connection with aiding and abetting. These are the crimes, charged or uncharged, that an aider and abettor participated in, of which the crime of conviction was a reasonably foreseeable consequence. Here, there was evidence of target crimes of robbery and burglary (of which [Petitioner] was convicted), as well as assault.

A trial court has a duty to instruct sua sponte on target crimes as part of the aiding-and-abetting instruction if the prosecution is relying on the natural and probable consequences doctrine. (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 266.) The record indicates that a party (it is unclear which one) requested these instructions, but the request was either refused or withdrawn. Instead, the court's instructions addressed natural and probable consequences only as part of an instruction on conspiracy. [Petitioner] has not argued that this was prejudicial error, and *Prettyman* held that this type of instructional error can be harmless. (*Id*. at pp. 270-271, 274.) We conclude that [Petitioner] has conceded the issue by failing to raise it.

In any event, there was ample evidence that [Petitioner] encouraged or facilitated the crimes that led up to the attempted murder. He participated in, and was convicted of, the burglary and robbery. According to Contrera's testimony, [Petitioner] was present with the others all night as Contreras lay bound on the floor and the house was ransacked. [Petitioner] was among those who kicked Contreras as he lay on the floor and personally removed some of Contreras's property. A reasonable jury easily could find from this evidence that [Petitioner] aided and abetted in the crimes that led up to the attempted murder.

The jury could also find, beyond a reasonable doubt, that the premeditated murder was a reasonably foreseeable consequence of the crimes [Petitioner] aided and abetted. A robbery and burglary in which the victim is bound, beaten, and threatened with death obviously is a crime in which it is reasonably foreseeable to each participant that a coperpetrator may harbor and carry out a deliberate plan to kill the victim.

Finally, there was also ample evidence to support a reasonable jury's conclusion that [Petitioner's] confederates committed the attempted murder willfully, deliberately, and with premeditation. In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, 73 Cal. Rptr. 550, our Supreme Court described three types of evidence that are relevant in determining whether premeditation, willfulness, and deliberation have been proved: (1) evidence of planning activity before the killing; (2) evidence about the prior relationship between the killer and victim that indicates the killer's motive; and (3) evidence about the nature of the killing indicating that it was done according to a preconceived design. The law does not, however, "require that these factors be present in some special combination or

7

that they be accorded a particular weight, nor is the list exhaustive." (*People v. Pride* (1992) 3 Cal.4th 195, 247.) The ultimate question is "whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*Ibid*.)

In this case, the victim testified that he was the six gang members' drug dealer, and that they beat him and threatened to kill him if he did not disclose the location of his money and drugs. This is evidence of prior relationship and motive. Contreras also testified that he was bound, made to lie on the floor, beaten, and threatened over a period of several hours before he was stabbed 30 to 40 times. This is evidence of planning activity before the attempted killing. It also shows that the nature of the attempted killing indicates reflection and design. It is inconsistent with a theory of rash impulse.

Based on this evidence, a reasonable jury could infer that the six gang members came to their drug dealer's house to take advantage of his drugs and hospitality. They would then steal what they hoped would be a significant stash of drugs and drug money and kill him, at least if they were dissatisfied with the results of the robbery. Alternatively, the jury could reasonably infer that the perpetrators developed a plan to murder Contreras after they were inside his house. In sum, the evidence was sufficient to prove that [Petitioner] was guilty of attempted willful, deliberate, and premeditated murder.

(Lodged Doc. No. 1, Opinion, at 4-7.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16. In a habeas corpus proceeding, a petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005). In addition, when a federal court reviews the factual record "that supports conflicting inferences [it] must presume- -even if it does not affirmatively appear in the record- -that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

Petitioner was tried as an aider and abettor or co-conspirator in the attempted murder charge. As such, under California law, there is no requirement that he personally acted in a

premeditated and willful manner under section 664(a). The conspiracy theory was amply

supported by the evidence, and there is not a reasonable probability that the trial's outcome

would have been different had the trial court instructed on the natural and probable consequences

doctrine in relation to the burglary and robbery charges. As a result, there is sufficient evidence

to establish that Petitioner was guilty of willful and premeditated attempted murder which was

reasonably foreseeable from burglary and robbery. Petitioner contends the appellate court

erroneously referenced the natural and probable consequences doctrine under an aiding and

abetting liability theory; however, the court also noted correctly that Petitioner was tried as a co-

conspirator of his fellow gang members and not a direct perpetrator of the attempted murder.

(Lodged Doc. No. 1, Opinion at 6-7; cf. CT 104-105; RT 266-267, 284-285, 294, 307.) It was

not unreasonable for the appellate court to find that some evidence supports the jury's finding of

willful, premeditated, and deliberate murder. Petitioner's claim to the contrary is without merit.

D.     Failure to Instruct on Lesser-Included-Offense of Attempted Voluntary Manslaughter

Petitioner contends that the trial court erred by failing to instruct the jury on attempted

voluntary manslaughter as a lesser included offense to attempted murder.

The Court of Appeal disagreed with Petitioner and ruled as follows:

> [Petitioner] argues that the court erred when it rejected a prosecution-
> requested instruction on attempted voluntary manslaughter as a lesser-included
> offense of attempted murder. He contends that the court's duty was to give the
> instruction sua sponte, so his own failure to request it or object to the court's
> refusal did not waive the issue.
>
> A trial court must give an instruction on a lesser-included offense "'"when
> the evidence raises a question as to whether all of the elements of the charged
> offense were present [citation], but not when there is no evidence that the offense
> was less than that charged."'" (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.)
> The court must give the lesser-included-offense instruction only if the evidence
> that the offense was less than charged is substantial enough to merit consideration
> by the jury. (*Id.* at p. 195, fn. 4.) Instructions must be given on all lesser-included
> offenses of which this is true. (*People v. Breverman* (1998) 19 Cal.4th 142, 161.)
>
> In this case, the prosecutor requested an attempted voluntary
> manslaughter instruction in anticipation of a defense theory that the stabbing arose
> from a sexual encounter between Contreras and Rafa. The court rejected this
> reasoning:
>
> "[The prosecutor]: It's a necessary lesser included, Your Honor. [¶] . . . [¶]

9

"THE COURT: . . . I am not going to give a voluntary or involuntary manslaughter attempted unless there is some evidence to support that. Was there a quarrel, you know, was there an imperfect self-defense.

"[The prosecutor]: Well, Your Honor . . . I won't really know that until he presents his case. But [he is] intimating that he is trying to get into the area of Mr. Contreras having any sexual relations with these subjects and being locked in a room with Rafa for a period of time.

"THE COURT: That doesn't require an attempted voluntary manslaughter instruction. Anyway, I am not going to give any instruction that there is not some basis in the evidence for. . . ."

When defense counsel attempted to introduce testimony by a police officer about the sexual orientations of Contreras and Sanchez and about whether Contreras and Rafa had any sexual contact, the court sustained the prosecutor's relevance objection. Although [Petitioner] does not assert that this evidentiary ruling was incorrect, he relies now on substantially the same argument the prosecutor raised when requesting the instruction.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

We disagree. There was no evidence on which a voluntary manslaughter verdict could have been based. Voluntary manslaughter is an unlawful killing, without malice, in which the defendant acts in a sudden quarrel or heat of passion or in unreasonable self-defense. (*People v. Blakely* (2000) 23 Cal.4th 82, 87.) Contreras gave uncontroverted testimony that he was stabbed while lying face down on the floor with his hands tied behind his back, several hours after the time when he was on the bed with Rafa and after several hours of being kicked and beaten. There was no evidence of any "type of disagreement" he had with Rafa or anyone else while in that position. It is difficult to image any sort of provocative or threatening behavior Contreras could have engaged in under those circumstances. The trial court ruled correctly when it refused to give the instruction.

(Lodged Doc. No. 1, Opinion, at 7-9.)

The state court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. First, there is no clearly established federal law that requires a state trial court to give a lesser included offense instruction. See 28 U.S.C. § 2254(d)(1); Beck v. Alabama, 447 U.S. 625, 638 & n.7 (1980) (holding that failure to instruct on lesser included offense in a capital case is constitutional error if there was evidence to support the instruction but left open "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does

1  not by itself present a federal constitutional claim); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106

2  (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital

3  case does not present federal constitutional question.)

4       Second, it was only the prosecutor who sought this instruction and only to negate a

5  potential defense by Petitioner of a sexual encounter between Contreras and Rafa (one of the six

6  gang members).  At trial, Petitioner's defense was an alibi and not that he acted under a sudden

7  heat of passion. (RT 235-240.)  Moreover, when defense counsel sought to elicit testimony from

8  a police officer regarding the sexual orientation of victim Contreras, the court sustained the

9  prosecution's objection.  Thus, there was no substantial evidence to support giving the lesser

10  included offense of attempted voluntary manslaughter instruction.  (RT 132-133, Lodged Doc.

11  No. 1, Opinion, at 9.)   Under these circumstances, the state court's ruling was reasonable, and

12  habeas relief is foreclosed.

13  E.    <u>Insufficient Evidence to Support Gang Allegations</u>

14       Petitioner contends there was insufficient evidence to support the jury's true finding of

15  the gang allegations under section 186.22(b)(1).

16       In relying on the applicable California law, the appellate court found Petitioner's claim to

17  be without merit and stated, in pertinent part, the following:

18       [Petitioner] first argues that no pattern of criminal gang activity was
proved.  He asserts that because the prosecution submitted evidence of only one

19  prior offense by a member of [Petitioner's] gang (an assault with a deadly weapon
by gang member Gilberto Lopez Delacruz committed in 2000), it failed to prove

20  two or more enumerated offenses as required by section 186.22, subdivision (e).
This argument is based on a misunderstanding of the law.  The Supreme Court has

21  held that the current offense counts as one of the two predicate offenses required
under section 186.22, subdivision (e), and therefore proof of one additional

22  offense is enough. (*People v. Gardeley* (1996) 14 Cal.4th 605, 625.) *People v.
Zermeno* (1999) 21 Cal.4th 927, on which defendant relies, is not to the contrary.

23  *Zermeno* held only that the prosecution cannot prove two predicate offenses by
proving that the defendant committed the current offense and a fellow gang

24  member aided and abetted in the same offense. (*Id*. at p. 931.)

25       [Petitioner] also argues that a pattern of gang activity was not proved
because the prosecution did not show (a) that Delacruz was still a gang member in

26  2001 when the stabbing in this case took place; (b) that Delacruz "was involved
with any of the participants in the instant crime"; or (c) that "any other gang

27  member had been involved with Delacruz's prior incident."  The statute does not
require this type of showing and [Petitioner] cites no authority for the view that it

28  does.

11

Next, [Petitioner] argues the prosecution did not prove that the subject crimes were committed "for the benefit of, at the direction of, or in association with" a gang or "with the specific intent to promote, further, or assist" a gang, as required by section 186.22, subdivision (b)(1). We conclude that the People presented substantial evidence in support of these elements. Except for his challenge to the evidence of a pattern of criminal gang activity, [Petitioner] does not contend there was insufficient evidence that the Big Time Locos were a criminal street gang or that he and the other five who attacked Contreras were members of it. In light of this, Contreras's uncontroverted testimony about the collective actions of the six in restraining, attacking, and robbing him was sufficient to permit the jury to find that the crime was committed "for the benefit of, at the direction of, or in association with" the Big Time Locos. When six gang members jointly commit a crime like this, it strains credulity to suggest that their common gang membership is a coincidence and the crime is not committed in association with the gang or for its benefit. The jury could reasonably reach a contrary conclusion beyond a reasonable doubt.

The People proved [Petitioner's] "specific intent to promote, further, or assist" his gang through the combination of Contreras's description of the attack and the testimony of the police gang expert, Detective Joe Aguilar. Aguilar testified that a robbery committed by gang members can promote or assist the gang by providing money and drugs "which they could use to recruit other gang members [and] as a tool to be able to throw their parties" and similar activities. He also testified that a violent attack by gang members can promote or assist the gang by enhancing its reputation as a powerful force: "It shows that they are vicious, they are not to be [rivaled] ... and it establishes a reputation on the street." This also helps to secure the gang's territory by instilling fear in rival gangs and the community. After hearing Contreras's account of the crimes and Aguilar's testimony, the jury could reasonably infer that defendant had the required specific intent.

We conclude the evidence was more than sufficient to prove the gang enhancement allegations.

(Lodged Doc. No. 1, Opinion, at 9-12.)

To the extent Petitioner alleges that the state court misapplied or erred under California law, his claim is not cognizable in this forum. 28 U.S.C. § 2254(d ); Bradshaw, 546 U.S. at 76; Jackson, 443 U.S. at 324, n.16 (habeas review "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law"). Furthermore, the state appellate court reasonably found that the Jackson rule was satisfied because there was sufficient evidence to demonstrate the present crimes were committed "for the benefit of, at the direction of, or in association with" a gang or "with the specific intent to promote, further, or assist" a gang, as set forth under section 186.22, subdivision (b)(1). There was expert testimony along with testimony by the victim regarding the collective actions of the six in furtherance of their

gang membership. The evidence consisted of the attempted murder victim's testimony that the six members jointly restrained, attacked, and robbed him. (Lodged Doc. No. 1, Opinion, at 11.)

It was Detective Aguilar's opinion that the instant offenses were committed for the benefit of the BTL criminal street gang since it would have provided the gang with drugs and money. It also promoted the gang's violent and retaliatory reputation within the community. These actions demonstrated to rival gang members that the BTL gang is violent and will control its own turf. (RT 190-192.) Accordingly, the state court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

F.    Sentencing Errors

Petitioner contends that the trial court violated his Sixth Amendment right as interpreted in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), to a jury trial determination on the sentencing factors utilized to impose the upper term sentence.

1.    State Court Decision

The last reasoned decision of the California Court of Appeal[2] denied the claim as follows:

> [Petitioner] asserts that his sentence violates the Sixth Amendment as interpreted in *Blakely v. Washington* (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. Both the decision to impose the upper term for robbery and the decision not to apply section 654 to stay the sentence for robbery were improperly based, he contends, on facts not found by the jury beyond a reasonable doubt.

> After this case was submitted for decision, our Supreme Court issued its decision in *People v. Black* (June 20, 2005, S126182) __ Cal.4th __. The court held that the imposition of upper terms in *United States v. Booker* (2005) 160 L.Ed.2D 621, 125 S.Ct. 738. (*People v. Black*, *supra*, __ Cal.4th __ [pp. 1, 27].) The court further held that the imposition of consecutive sentences under California law is unaffected by *Blakely* and *Booker*. (*Id*. [pp. 1, 28].) Although the section 654 issue was not presented by the facts in *Black*, the Supreme Court explained that "the decision whether section 654 requires that a term be stayed is analogous to the decision whether to sentence concurrently," and also does not implicate a defendant's Sixth Amendment right to a jury trial as interpreted in *Blakely* and *Booker*. (*Id*. [pp. 30-31].) Accordingly, we must reject defendant's arguments.

(Lodged Doc. No. 1, Opinion, at 18-19.)

---

[2] The California Supreme Court issued a summary denial. (Lodged Doc. No. 2.)

On collateral review, the Tulare County Superior Court rejected Petitioner's renewed claim of sentencing error holding that <u>Cunningham v. California</u>, 548 U.S. 270 (2007) is not retroactive to Petitioner's case which became final two years prior. (Lodged Doc. No. 5.) The Court of Appeal and California Supreme Court also rejected the petition without prejudice to renewing after the California Supreme Court ruled on <u>In re Gomez</u>, 45 Cal.4th 650 (2009). (Lodged Doc. Nos. 6 & 7.)

The California Supreme Court decided <u>In re Gomez</u>, 45 Cal.4th 650, on February 2, 2009, but Petitioner did not renew his claim in the state court.

In imposing the aggravated term of six years on Count Three, the trial court stated:

> The basis for the aggravated term, upon review of the probation report, the defendant's crime involved substantial violence, great bodily injury to the victim, disclosing a high degree of cruelty and viciousness on the part of the defendant and co-defendants, pursuant to Rule 4.421(a)(1).

> The victim was extremely vulnerable in that he was unarmed and outnumbered by the defendant and the co-defendants, pursuant to [Rule] 4.421(a)(3).

> The manner in which the crime was carried out indicated planning, sophistication, professionalism, pursuant to Rule 4.421(a)(8).

> The defendant took advantage of position of trust and confidence to commit the offense, pursuant to Rule 4.421(a)(1). There are no mitigating factors.

(RT 385-386.)

The most clear finding is that Petitioner's offenses resulted in great bodily harm and disclosed a high degree of cruelty and viciousness. <u>See</u> <u>Butler</u>, 528 F.3d at 648 (under California law, "only one aggravating factor is necessary to set the upper term as the maximum term.") It was not disputed that in the late evening, six members of an Orosi gang went to the Contreras's home-who was acquainted with the six men having previously sold them drugs. About an hour later, Contreras and Rafa, one of the gang members, went into Contreras's bedroom. About a half hour later, two of the other gang members entered the bedroom and held a gun to his head. Contreras was forced to the ground, and his hands were tied behind his back with an extension cord. Over a period of three to four hours, the gang members took turns kicking Contreras and demanding the location of the drugs and money or he would be killed. Petitioner was identified

by the victim as one of the individuals who participated in the beating.  At about dawn, one of the

gang members stabbed Contreras with a knife approximately 30 to 40 times as he lay bound on

the floor.  As a result of the attack, Contreras was hospitalized for eight days.  The gang

members, including Petitioner, left the house with various items of Contreras's personal

belongings.  Based upon the undisputed factual summary, and the fact that Petitioner was

convicted of burglary and attempted murder, the Court does not have any doubt that the jury

would have found beyond a reasonable doubt that Petitioner's robbery involved great bodily

harm and disclosed a high degree of cruelty and viciousness.  Accordingly, any error in this

instance was clearly harmless.[3]

Furthermore, to the extent Petitioner contends that the state court erred in denying his

consecutive-terms claim, it fails under § 2254(d)(1).  The United States Supreme Court recently

held the Sixth Amendment does not prevent States from assigning to judges, rather than to juries,

the findings of facts necessary to impose consecutive, rather than concurrent, terms for multiple

offenses.  Oregon v. Ice, 555 U.S. ___, 129 S.Ct. 711, 714-715 (2009).

G.    Ineffective Assistance of Trial Counsel

In Grounds Six and Seven, Petitioner contends that trial counsel was ineffective for (1)

failing to investigate the facts and law of the case to provide him with information in which to

make an informed and intelligent decision to accept the prosecutor's plea offer; and (2) failing to

conduct a reasonable pretrial investigation by not interviewing or calling his codefendants and

others as witnesses.  (Amended Petition, at 7.)  Although Petitioner presented this claim as two

separate claims in his petition, the state court addressed both claims as one, and this Court will

do the same.

---

[3] Because of this finding, the Court does not reach Respondent's argument that although the state court did not expressly rely on the fact of Petitioner's prior conviction, that factor alone supports the imposition of the upper term.

1          1.     State Court Decision

2          The last reasoned decision of the Tulare County Superior Court, denied the claim stating,

3    in relevant part:

4          1.  The claims are not timely presented.  On this basis, the Petition is summarily
           denied.

           Petitioner filed this Petition nearly four years after he was sentenced.  Writs of
           habeas corpus must be filed without substantial delay.  If there is substantial
           delay, petitioner must provide good cause for the delay.  (In re Robbins (1998) 18
           Cal.4th 770, 778.)  This burden applies to indigent petitioners appearing in pro
           persona.  (In re Clark (1993) 5 Cal.4th 756, 765.)

           As to his reasons for delay, Petitioner asserts he does not speak English and is
           illiterate.  This does not satisfy the burden.  (See, In re Saunders (1970) 2 Cal.3d
           1033, 1040.)  Unlike Saunders, petitioner does not claim he was unaware of any
           facts that he claims as the basis for relief.  In two previous applications for writ,
           petitioner demonstrated he had access to the pleading filed in his case, and, hence,
           is imputed with the knowledge of their contents.  If petitioner was ignorant of
           claims, it is not a justifiable excuse.

           On the bas[is] of petitioner's failure to timely present his claims, the Petition is
           summarily denied in its entirety.

           2.  Petitioner has filed two previous Writs.  Except for the claims relating to juror
           misconduct, petitioner has failed to raise the current claims in those prior
           applications.  This Petition is an abuse of the writ process and is summarily
           denied on this separate basis.

           Generally, a habeas petitioner must raise all claims in one timely filed petition.
           When, as here, a subsequent petition alleges new and different grounds for relief,
           the petition is subject to denial as an abuse of the writ process.  An exception may
           be allowed if the petitioner demonstrates that a fundamental miscarriage of justice
           occurred.

           Petitioner fails to demonstrate that a fundamental miscarriage of justice occurred.
           The only Clark, supra, exception claim is petitioner's averment that new evidence
           demonstrates he is factually innocent based upon his nephew's recantation of prior
           statements.  Newly discovered evidence is a basis for relief in a successive
           petition only if it undermines the prosecution's entire case and points unerringly
           to innocence or reduced culpability.  (Id. at 765.)

           On its face, the nephew's recantation does not meet the Clark standard for relief.
           The nephew was not the victim.  At trial the victim identified [Petitioner] as a
           person known to him, saw him perpetrating the offense and recognized
           [Petitioner's] voice while the victim was tied up and face down during the six
           hour assault.  The nephew's statement made after his own conviction after plea
           [sic] and completion of sentence does not undermine the prosecution's entire case.

           The petitioner has made successive claims.  As to the nephew's statement, the
           petitioner has failed to demonstrate that a fundamental miscarriage of justice has
           occurred.

3. On the face of the petition, the claims of ineffective assistance of counsel fail to establish grounds for issuance of an Order to Show Cause.

In order to prevail on a claim of ineffective assistance of counsel petitioner must establish incompetent performance by counsel. If such incompetence is shown, then the petitioner must show that the incompetence resulted in prejudice. (In re Harris (1993) 5 Cal.4th 813.) While the Petition is summarily denied for the reasons separately stated in #1, and #2, the court will proceed to address the other claims made by petitioner.

a. Claim counsel misadvised petitioner as to the potential sentence

The case of In re Alvernaz (1992) 2 Cal.4th 924, addressed a situation similar to the one presented in this application for writ. There, petitioner claimed his lawyer told him the maximum sentence he faced, if convicted, was eight years in prison with a significant reduction after consideration of custodial credits. In reality, the petitioner faced a life term if convicted. The petitioner proceeded to trial and was convicted.

Alvernaz claimed he would have accepted a plea offer had he known he faced a life term. The Alvernaz court ruled the allegations were insufficient to grant an evidentiary hearing. The court said among the factors to be considered was whether the evidence proffered by petitioner showed the petitioner had been amenable to resolving this matter by a negotiated plea. The court indicated that Alvernaz['s] continual professions [sic. protestations] of innocence contradicted petitioner's self serving claim he would have accepted the plea agreement.

Here, as in Alvernaz, [Petitioner] continues to claim factual innocence. Here, like in Alvernaz, [Petitioner] claims he believed his chances at prevailing was good, indicating he would reject a plea agreement and that such rejection would be motivated by a hope of being successful at trial.

Here, there is no evidence a plea bargain was ever offered or was a possible resolution. Further, there is no showing or claim the trial court would have accepted a negotiated plea agreement between [Petitioner] and the prosecution if one was offered. Given the charges lodged against [Petitioner], plea bargaining was prohibited pursuant to Penal Code section 1192.7. The petition makes no assertion there were factors present that would have provided an exception to the prohibition.

The factual claims of Petitioner provide no basis to instill any confidence Petitioner would have accepted a plea offer if one had been offered. There is no evidence there ever was an offer. Hence, there is no prima facie showing of prejudice resulting from the claimed incompetence of counsel as is required for relief pursuant to Harris, supra.

b. Claim trial counsel failed to conduct an adequate pretrial investigation

Petitioner claims his attorney was inadequate because counsel failed to interview [Petitioner's] codefendants. His codefendants were not subject to being interviewed by Petitioner's attorney without consent of their counsel. There is no basis to surmise such consent would have been conferred upon counsel.

Petitioner claims his trial counsel failed to have five named potential witnesses interviewed. There is no showing that the assertion is based upon any facts and

that the claim is anything more than a mere supposition on the part of the petitioner. Further, except as to a statement from petitioner's nephew, Rafael Ponce Cruz, there is no showing that favorable evidence would have been obtained from these people.

There is not sufficient evidence to grant relief or hearing on the petition. There is no showing of prejudice under the <u>Harris</u> standard, supra.

3. Petitioner's claim of factual innocence

Petitioner claims the recantation of his counsel establishes that petitioner is factually innocent and the writ should issue on this basis. "Newly discovered evidence does not warrant relief unless it is of such character as will completely undermine the entire structure of the case upon which the prosecution was based." (<u>In re Hardy</u>, <u>supra</u>, at 1016.)

The court has previously analyzed this claim in #2, above. The analysis will not be reiterated. The recantation does not undermine the prosecution's case and is not a basis for further examination.

(Lodged Doc. No. 5, Opinion, at 1-3.)

     2.    <u>Applicable Law</u>

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

18

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. <u>Strickland</u>, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. <u>Id.</u>; <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. <u>Strickland</u>, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of <u>Williams v. Taylor</u>, 529 U.S. 362 (2000). <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (2000).

3. <u>Analysis of Claim</u>

The California Court of Appeal requested trial counsel to submit a response or declaration to address Petitioner's ineffective-assistance-of-counsel claims. After receiving counsel's declaration filed under seal, the state appellate court summarily denied the claim. (Lodged Docs. Nos. 6 & 6.5.) The California Supreme Court denied the petition without comment. (Lodged Doc. No. 7.)

a. <u>Procedural Default</u>

Respondent initially argues that federal habeas corpus review is barred because the state court denied Petitioner's claims on an adequate and independent state rule by belatedly raising his claim in his second round of habeas petitions.

The Supreme Court has held that a federal court will not review claims in a petition for writ of habeas corpus if the state court has denied relief on those claims on a state law ground that is independent of federal law and adequate to support the judgment. <u>Coleman v. Thompson</u>,

501 U.S. 722, 750 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id., at 730-32.

There are limitations as to when a federal court should invoke procedural default and refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). In this case, the California Supreme Court's citation to Robbins clearly indicated its judgment rested on the state bar of untimeliness. Therefore, this first condition is met.

The state law ground must also be independent of federal law. "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse, 244 F.3d at 704, citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996), quoting Coleman, 501 U.S. at 735 ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'") "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000), quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985). In Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir.2003) (en banc), the Ninth Circuit determined that California's untimeliness rule was "independent" of federal law for purposes of procedural default based on the California Supreme Court's decision in Robbins.

Next, a federal court may only impose a procedural bar on claims if the procedural rule that the state used is "adequate" to support the judgment. To be adequate, "the state's legal grounds for its decision must be firmly established and consistently applied." King v. LaMarque, 464 F.3d 963, 965 (9th Cir. 2006), citing Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003). To be firmly established and consistently applied, the rule must be clear and certain. King, 464 F.3d at 965, citing Melendez v. Pliler, 288 F.3d 1120, 1124 (9th Cir. 2002); see also Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (The state procedural rule used must be clear, consistently applied, and well-established at the time of the petitioner's purported default). In

King, the Ninth Circuit noted that before the decision in In re Clark, 5 Cal.4th 750 (1993), California's timeliness bar was too uncertain to be a procedural bar in capital cases. 464 F.3d. at 966, *citing* Morales v. Calderon, 85 F.3d 1387, 1391 (9th Cir.1996). However, the Ninth Circuit remanded the case to the district court to determine whether "California's "substantial delay" rule has become sufficiently clear and consistently applied to justify barring federal review." King, 464 F.3d at 968. The Robbins timeliness rule is an "adequate" state rule as it has become sufficiently clear and consistently applied. See e.g. Martin v. Walker, No. S-99-0223, 2008 U.S. Dist. WL 652131 (E.D. Cal. Mar. 10, 2008.) Petitioner has failed to present any showing to demonstrate the inadequacy of the state procedure. Bennett, 322 F.3d at 586. Accordingly, Petitioner has failed to meet his burden under Bennett. If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at 1150.

The cause prong is established if Petitioner can demonstrate some "objective factor" precluded him from raising his claims in the state court. McClesky v. Zant, 499 U.S. 467, 493-494 (1991). Petitioner has failed to present any "objective factor" which precluded him from raising these claims in the state court earlier. Accordingly, there is no showing of cause. In addition, for the reasons explained *infra*, Petitioner has not and can not demonstrate prejudice because there is no merit to his claims.

       b.    Misadvisement About Potential Sentence For A Plea Offer (Ground Six)

Petitioner contends that defense counsel failed to provide him with the necessary information to make an informed decision as to whether to accept the plea offer. Petitioner's claim is without merit.

Defense counsel, Richard Rumery, submitted a declaration to the state court, which declared, in pertinent part, the following:

> Mr. Galvan accurately asserts that there was a plea offer with a maximum sentence of six years. This plea offer was communicated to me by the Deputy District Attorney. Specifically, the offer was for Mr. Galvan to plead either guilty

21

or no contest to one count of robbery (Penal Code section 211) and that the remaining counts and special allegations would be dismissed. Knowing that Mr. Galvan was facing a life sentence plus additional years, I of course thought that this would be a very decent resolution of his case. From the very beginning I knew Mr. Galvan was facing a life sentence. . . . Additionally, my normal practice when getting a new case is to review the charges and analyze what my client's maximum exposure is. I did that in this case because I remember knowing Mr. Galvan's maximum exposure. I did my analysis assuming Mr. Galvan was convicted on all counts and special allegations at the same time knowing that some of the counts would be stayed pursuant to Penal Code section 654. Although I don't have any notes reflecting such, my recollection was that Mr. Galvan was facing a sentence of life plus 14 to 16 years which would run consecutively. I knew right away that this was a very serious case with potentially dire consequences.

. . . After discussing the offer to settle with the Deputy District Attorney, I made arrangements to meet with Mr. Galvan at the county jail. The first meeting I had with him after the offer was made occurred at the main jail which is next to the Tulare County Courthouse in Visalia. . . . Because Mr. Galvan only spoke Spanish, I took Gloria Barragan to interpret. At the time, Ms. Barragan was a legal assistance who worked in my office and she is fluent in both English and Spanish. . . . I explained to Mr. Galvan that this was a very good offer in light of the fact that he was facing life plus many additional years if he went to trial and was convicted. I remember explaining to Mr. Galvan that he would still be a very young man once he was released and roughly calculated when he would be released based upon his custody credits. It is my recollection that he had been in custody for a lengthy period of time when we had this discussion. Additionally, when I have a case involving a life sentence, I always explain to my clients that life can mean life. Even though he is eligible for parole oftentimes parole is not granted and even if it is granted that it can be reversed by the Governor. I explained this process to Mr. Galvan. I always knew that this case involved a potential life sentence and explained such to Mr. Galvan.

. . . During my discussion with Mr. Galvan regarding the plea offer, he asked me what his chances were if we went to trial. . . . I explained that trials are always risky. It is never known what a jury will do even when one thinks the evidence is strong in his favor. I explained the advantages of taking a plea which include knowing what the future holds. In this case Mr. Galvan would know that he faced a maximum six year sentence. I explained that a jury trial is unpredictable and that if he were convicted on some or all of the charges including the special allegations that he faced a more sever sentence than the six years offered. I reminded him that he was facing a life sentence. At no point during my discussion did I assure Mr. Galvan that he would be acquitted if he went to trial. Those are words that never cross my lips. I never make promises to clients and I didn't make any such promise to Mr. Galvan. I personally believe making such promises to a client facing serious criminal charges (or even minor charges) is unethical. I never do it and I did not tell Mr. Galvan he would be acquitted. However, when discussing favorable aspects of a client's case, I do let them know what evidence is favorable and what details in their case are defensible. However, I always explain that trials are unpredictable and oftentimes juries overlook favorable evidence if they believe a defendant is guilty. With Mr. Galvan, I did not have a totally optimistic opinion of the evidence. One of the victims (Albert Contreras, aka "La China") positively identified Mr. Galvan as having been present and involved. The only optimistic thing I explained to Mr. Galvan was that the jury may not have a favorable opinion of the victims, both

Contreras and Jose Sanchez, aka "Julia." In part, I believe this is why the District Attorney made such a generous offer. Other than passing on my opinion of the alleged victims, I did not express optimism as to Mr. Galvan's chances of getting a good result at trial. I certainly didn't tell him he would be acquitted.

. . . At no point in my conversations with Mr. Galvan did I ever tell him that his maximum exposure was nine years. I have no idea where nine years comes from. I knew Mr. Galvan was facing life with the possibility of parole for the attempted murder, that he was facing 3, 6, or 9 years for the first degree robbery, that he was facing 2, 3, or 4 years for the assault with deadly weapon, that he was facing 2, 4, or 6 years for the residential burglary and that the special allegations totaled 14 years. I discussed all of these maximum consequences with Mr. Galvan and never discussed a maximum consequence if he declined to accept the plea and went to trial. Nine years was never discussed with Mr. Galvan.

During this first conversation with Mr. Galvan regarding the plea offer, I got the strong impression that he didn't believe or that he didn't understand that he was facing a life sentence. He kept stating that he was innocent and that he did not do anything wrong. I explained to Mr. Galvan that even though he believed he was innocent, alleged victim Contreras was placing him at the scene. Additionally, during this discussion Mr. Galvan repeatedly asserted that six years in custody was a long time. He kept saying "that is a long time" that he couldn't do six years. In response, I agreed with Mr. Galvan that six years was a long time but that if he was convicted of attempted murder at trial he was facing a life sentence, thus he would be serving a sentence significantly longer than six years. I attempted to explain to Mr. Galvan that he would not have to serve the entire six years. Based on the amount of time he had already been in custody, plus additional good time/work time he would be released in the not to distant future. I explained to Mr. Galvan that he would still be a young man when he got out and I remember telling him his projected age upon release (24, 25 or 26 ?) However, I don't exactly remember the age discussed. Mr. Galvan was clearly frustrated feeling that six years was a long time. I ended this first conversation asking Mr. Galvan to think about the offer, that I thought he should take it, and that I will discuss it further with him later.

A week or two later, Gloria Barragan and I went to the jail to meet with Mr. Galvan a second time regarding the plea offer. Again I told Mr. Galvan that the offer was a plea to robbery with a six year maximum sentence. Mr. Galvan kept saying that six years is "too long" and rejected the offer. I reminded him that he was potentially looking at a life sentence if he rejected the offer. He nevertheless rejected the settlement offer. . . . Mr. Galvan was repeatedly informed by me that he was facing a life sentence. Mr. Galvan was never told that his maximum exposure was nine years. Unfortunately for him, Mr. Galvan is the one who decided to reject the six year settlement offer. Mr. Galvan's rejection was made over my objection. I might have even stated such on the record, I just don't recall.

(Lodged Doc. No. 7, Exhibit C-1, Declaration of Richard Rumery, Esq. at pgs. 3-7.)

It is clear from counsel's detailed declaration that Petitioner was fully aware of the consequences of going to trial in lieu of taking the plea offer. Mr. Rumery's declaration clearly demonstrates that counsel informed Petitioner of the strengths and weaknesses of his case,

informed him of the plea offer and potential exposure if convicted on all counts, and advised Petitioner to accept the offer. However, Petitioner repeatedly refused protesting his innocence. Accordingly, in light of the evidence before this Court, there is no showing that counsel did not provide Petitioner with the information necessary to make an informed decision about the plea offer. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

        c.      Failure To Interview Or Call The Codefendants And A Victim (Ground Seven)

Petitioner's claim that trial counsel rendered ineffective assistance by failing to interview his co-defendants is likewise without merit. The state court correctly pointed out that Petitioner's "co[-] defendants were not subject to being interviewed by Petitioner's attorney without the consent of counsel. There is no basis to surmise such consent would have been conferred upon counsel." (Lodged Doc. No. 5, Order, at 3.) Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. However, such duty "does not necessarily require that every conceivable witness be interviewed." Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995) (citations and quotations omitted). In order to succeed on a failure-to-investigate claim Petitioner must demonstrate what information would have been obtained through the investigation, and whether, assuming the evidence is admissible, it would have produced a different result. See Hamilton v. Vasquez, 17 F.3d 1149, 1157 (9th Cir. 1994); Wade v. Calderon, 29 F.3d 1312, 1316-1317 (9th Cir. 1994). To determine if the failure to investigate actually prejudiced a defendant the Court must weigh it against the "totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

Counsel was not deficient for failing to interview or call Petitioner's co-defendants as witnesses because he did not have the ability to do so absent consent by the co-defendants' attorneys. Thus, counsel could not have rendered ineffective assistance for failing to present a

meritless motion or argument.  James v. Borg, 24 F.3d 20, 27 (9ᵗʰ Cir. 1994); Boag v. Raines, 769 F.2d 1341, 1344 (9ᵗʰ Cir. 1985).  Therefore, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

In addition, counsel's failure to interview or call victim, Jose Sanchez ("Julia"), was not ineffective because he could not be located at the time of trial.  Sanchez, a transvestite, was the testifying victim's roommate at the time of the assault.  (RT 58-59.)  Sanchez, like Contreras, was assaulted by the gang.  (RT 24-25, 28-29, 46-47, 58, 94.)  As a result of the prosecutor's inability to locate Sanchez for trial the jury acquitted Petitioner of the charges (counts 2 and 4) naming Sanchez as the victim.[4]  Petitioner contends that Sanchez would have provided exculpatory evidence had counsel interviewed him and presented his testimony at trial.  (Lodged Doc. No. 7; Amend. Petition at 7.)  Petitioner's claim is based on nothing more than pure speculation.  He fails to demonstrate what information would have been obtained by the investigation (assuming such investigation could be had), and whether, assuming the evidence is admissible, it would have produced a different result.  See Hamilton, 17 F.3d at 1157; Wade, 29 F.3d at 1316-1317.  Petitioner simply fails to present any evidence to support his assertion.

In any event, it is highly unlikely Petitioner would have obtained a different result had Sanchez been located, procured for trial, and testified.  Petitioner cannot overlook the fact that victim Contreras, who personally knew Petitioner, specifically identified him as one of the assailants.  (RT 86-87.)  Furthermore, presenting the testimony of victim Sanchez would have likely hurt, not helped, Petitioner's defense because he was acquitted on the counts relating to Sanchez without his testimony.  Accordingly, there is no merit to Petitioner's claim that counsel rendered ineffective assistance by failing to interview or call Sanchez (who could not be procedure at the time of trial).

---

[4] Contreras's former home burned down shortly after he testified in a related case.  (RT 50-51; Lodged Doc. No. 1, Opinion, at 3.)  When Sanchez was contacted at the home after the assault, he was lying in his bed with the covers pulled over him.  He was "frazzled" and scared, and did not cooperate with the deputy and refused medical treatment.  (RT 101-103.)

H.    Actual Innocence/Gateway Claim

In Ground Eight, Petitioner raises an "actual innocense, gateway claim" in an attempt to circumvent his claims from being procedurally defaulted.  The Tulare County Superior Court denied this claim finding he failed to demonstrate a fundamental miscarriage of justice because, notwithstanding his nephew's recantation, victim Contreras positively identified Petitioner as one of the assailants.  (Lodged Doc. No. 5, Opinion, at 2-3.)  Both the California Court of Appeal and California Supreme Court summarily denied the claim.  (Lodged Doc. Nos. 6 & 7.)

In order for Petitioner to demonstrate a miscarriage of justice he must establish that the constitutional error complained of probably resulted in a conviction of an innocent person. Schlup v. Delo, 513 U.S. 298, 327 (1995); accord House v. Bell, 547 U.S. 518 (2006).  Mere reasonable doubt is not sufficient; rather, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  Schlup, 513 U.S. at 326.  Petitioner bears the burden of proof by a preponderance of the evidence, such that 'no reasonable juror' would have convicted him.' Lorentsen v. Hood, 223 F.3d 950, 954 (9th Cir. 2000); Dejan v. United States, 208 F.3d 682, 686 (9th Cir. 2000).

In this instance, the state court's denial of this claim was not an objectively unreasonable application of Schlup.  28 U.S.C. § 2254(d)(1).  Petitioner's claim is based on the recantation of his cousin which he alleges supports his claim for factual innocence.  Notwithstanding the recantation, the victim identified Petitioner at trial as one of his attackers.  Furthermore, Petitioner presented an alibi defense through the testimony of his sister and the jury obviously rejected such testimony.[5]  Accordingly, the state court reasonably found that Petitioner failed to meet the Schlup requirement in demonstrating that no reasonable juror would have convicted him in light of the new evidence.  Schlup, 513 U.S. at 326; 28 U.S.C. § 2254(d)(1).

---

[5] Petitioner's sister Catalina Ponce testified that Petitioner was home at the time of the crime; however, she was impeached by a sheriff's detective who testified that she never told him she had not seen Petitioner since the evening preceding the crimes.  (RT 235-240, 259-260.)

26

I.    Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for failing to challenge the trial court's denial of his motion for new trial.

The state superior court denied this claim on habeas corpus review, stating:

6.  Claim appellate counsel was ineffective is without merit

The claim of jury misconduct was addressed in a previous writ petition.  It was denied.  To prevail on a claim of ineffective assistance of counsel, the petitioner must show prejudice as a result of the claimed ineffectiveness.  The court previously found the claim of jury misconduct was without merit.[6]  Where there was no jury misconduct there can be no prejudice arising from a failure to raise the issue on appeal.  Pursuant to Harris, supra, the claim is summarily denied.

(Lodged Doc. No. 5, Order at 4.)

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th

---

[6] The court was presumably speaking to the prior denial of the new trial motion on the merits in the state trial court.

Cir.1998).  The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance.  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court.  Id.  Appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by petitioner.  Id at 1434 n10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

Here, the state court found there was no misconduct and therefore no prejudice as a result. (Lodged Doc. No. 5, Order at 5.)  Because there was no merit to this claim, had appellate counsel raised it on appeal there is not a reasonable probability that the claim would have prevailed.  The trial court heard argument on Petitioner's motion for new trial based on juror misconduct.  The court made the factual finding and credibility determination that juror, Mr. Paul Verisimo, did not commit misconduct for not revealing his business relationship with the trial judge.  (RT 378-379.)  Mr. Verisimo acknowledged that he was the trial judge's tax accountant; however, he was never asked whether he knew the trial judge and if he had been asked he would have answered truthfully.  (Id. at 366.)  Mr. Verisimo's relationship with the trial judge was strictly business and limited only to the tax season. (Id.)  Accordingly, there was no merit to Petitioner's motion for a new trial.  Furthermore, under California law, there is no judicial misconduct for the trial judge's failure to advise the parties about his relationship with the juror because there is no requirement the judge ask potential jurors whether they know the judge or court personnel.  (RT 379; cf. Standards of Judicial Admin., § 3.25(c).)

Therefore, because neither the juror nor the trial judge committed misconduct, appellate counsel was not ineffective for failing to raise a meritless claim on direct appeal.  Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985).  Nor was there any prejudice from the tenuous business relationship between the trial judge and juror.  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

J.      Juror Misconduct Claim

Petitioner presents two interrelated claims in Grounds Eleven and Twelve, arguing that he was deprived of his right to an impartial jury, due process, and a fair trial, because Juror 11 Paul Verisimo "concealed" his business association with the trial judge. The Court will address these claims together.

1.      State Court Proceedings

As noted above, Petitioner presented this claim to the trial court by way of motion for a new trial arguing that Mr. Verisimo failed to disclose his business relationship with the trial judge. (RT 273-287.)

A different trial judge conducted an evidentiary hearing and Mr. Verisimo testified. Mr. Verisimo acknowledged that he was the trial judge's tax accountant for a "number of years. Ten or fifteen years." (RT 365, 368.) His relationship with the judge was "strictly business." (Id.) Mr. Verisimo testified that he never discussed the case with the trial judge before or after the trial. He did not reveal the relationship because he was never asked if he knew the judge. Instead, he was asked only whether he knew counsel or any of the witnesses.[7] Mr. Verisimo believed that the trial judge would have said something if it was warranted. (Id.)

The trial court denied the motion finding no juror misconduct stating:

> Well, I find that there is no prejudice here. Mr. [Verisimo's] relationship with Mr. – Judge Moran was of a very tenuous nature. Although it's my practice to do my standard questions, "Do any of you know any of the parties, any of the court personnel," if I see somebody in the jury I know, I ask – I disclose that. But that's not because I feel that there is any inherent prejudice if somebody is in the jury and they knew me.
>
> Mr. [Verisimo] had no duty to disclose that he was Judge Moran's accountant. And I've researched cases trying to find something where a case was reversed because a judge knew a juror and didn't disclose it. I found many cases where the failure to disclose the information by jurors was significantly much worse than what's occurred here. And the case not reversed and no [sic] – and they use the harmless error test and also found that there was no misconduct.
>
> I find absolutely no misconduct on Mr. [Verisimo's] part and I don't find any misconduct on Judge Moran's part based upon the relationship that they had,

---

[7] The trial court confirmed the jury was only asked whether they knew any of the parties, the attorneys, or the witnesses in the case. (CT 369.) There was also no written juror questionnaires in this case. (Id. at 379.) Mr. Verisimo clarified that he never had the intention of concealing his relationship with the trial judge. (Id. at 370.)

29

that being of about a 30-second nature every year. Even if it was more than that, I don't find that that rises to the level of prejudice that would justify a new trial motion. So the motion for new trial is denied. . . .

(RT 378-379.)

Petitioner did not raise this claim on direct appeal. (See Lodged Doc. No. 1.) Rather, Petitioner presented it in his first round of post-conviction collateral review in the state superior court, which denied the claim for failure to raise on direct appeal. (Lodged Doc. No. 3.) Petitioner then filed a petition in the California Supreme Court which issued a summary denial. (Lodged Doc. No. 4.)

Petitioner raised the claim again in a second round of habeas corpus review in the state superior court. As with the preceding claim, it was rejected as follows:

> The claim of jury misconduct was addressed in a previous writ petition. It was denied. To prevail on a claim of ineffective assistance of counsel, the petitioner must show prejudice as a result of the claimed ineffectiveness. The court previously found the claim of jury misconduct was without merit. Where there was no jury misconduct there can be no prejudice arising from a failure to raise the issue on appeal. Pursuant to <u>Harris</u>, <u>supra</u>, the claim is summarily denied.

(Lodged Doc. No. 7.)

2. <u>Procedural Default</u>

The first state post-conviction collateral petition raising these claims was denied on procedural grounds. (Lodged Doc. No. 3.) The second petition was also denied but with a citation to <u>In re Harris</u>, 5 Cal.4th 813 (1993). (Lodged Doc. No. 5.) It is well established under California law that a habeas petitioner cannot generally raise claims in a petition that could have been raised on direct appeal. <u>In re Harris</u>, 5 Cal.4th at 834-835; <u>see</u> <u>In re Dixon</u>, 41 Cal.2d 756, 759 (1953); <u>In re Waltreus</u>, 62 Cal.2d 218, 222-223 (1965). <u>In re Harris</u>, stands for the proposition, inter alia, that the claims raised should have been raised on appeal. Therefore, Respondent has adequately plead the existence of an independent and adequate state procedural ground. <u>Bennett v. Mueller</u>, 322 F.3d 573, 586 (9th Cir. 2003). Petitioner has failed to meet his burden by setting forth specific factual allegations to demonstrate that the <u>Harris</u> rule has not been consistently applied. <u>Id</u>. Therefore, this claim is procedurally barred. In any event, for the reasons explained *infra*, the claim is without merit and must be denied. 28 U.S.C. § 2254(d).

3. <u>Analysis of Claims</u>

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const., Amends. 6 and 14; <u>see</u> <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968). In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." <u>United States v. Klee</u>, 494 F.2d 394, 396 (9th Cir.), <i>cert. denied</i>, 419 U.S. 835 (1974). Although it is generally preferred that a trial court hold an evidentiary hearing when allegations of juror misconduct arise, it is not always required, particularly when the court knows the exact scope and nature of the misconduct. <u>See</u> <u>United States v. Halbert</u>, 712 F.2d 388, 389 (9th Cir.1983); <u>United States v. Hendrix</u>, 549 F.2d 1225, 1227 (9th Cir.1977); <u>see also</u> <u>United States v. McVeigh</u>, 153 F.3d 1166, 1187 (10th Cir.1998), <i>cert. denied</i>, 119 S.Ct. 1148 (1999). The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." <u>Rushen v. Spain</u>, 464 U.S. 114, 118 (1983), <i>quoting</i> <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).

Here, for the same reasons explained above in section I, there is no merit to Petitioner's claim because the juror's minimal relationship with the trial judge could not and did not deprive him of his constitutional right to a trial by an impartial jury. Accordingly, Petitioner is not entitled to habeas corpus relief.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and,

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served

and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    February 10, 2010**                    /s/ Sandra M. Snyder
                                                                UNITED STATES MAGISTRATE JUDGE